MILKEY, J.
*548 At the center of this case is an undeveloped parcel of land (parcel) in the town of Norfolk (town). Because the parcel measures only 7,650 square feet, it does not meet the minimum lot size requirement set forth in the town zoning by-law. The relevant town officials concluded that the parcel did not enjoy "grandfathered" status, because it was held in common ownership with adjacent lots when the town first adopted a minimum lot size *549 requirement in 1953, and that therefore the lots had to be treated as one under the doctrine of merger. On cross motions for summary judgment, a judge of the Land Court rejected that position, ruling that the parcel was not rendered unbuildable based on its being held in common ownership with adjacent land in 1953.
Nevertheless, after trial, the judge ruled that the parcel was rendered unbuildable under the doctrine of merger based on a more recent event, namely, the acquisition of the parcel on September 14, 2012, by the Kneer Family Revocable Trust (trust). The sole beneficiary of the trust at that time was, and remains, the Kneer family matriarch, Mildred J. Kneer, who also serves as a cotrustee. As of the date that the trust purchased the parcel, the other cotrustee was Deirdre Mead, one of Kneer's three daughters. As the judge observed, in her capacity as cotrustee, Mead had significant control over the trust's assets, albeit subject to her fiduciary duties to the trust's beneficiary, her mother. When the trust purchased the parcel, Mead herself already owned adjacent property, where she long has lived. The judge ruled that the confluence of Mead's broad authority over the parcel as cotrustee and her ownership of the adjacent property in her own name effectively placed the two properties in common ownership. Based on this, he concluded that the properties must be treated as one for zoning purposes under the doctrine of merger, explaining his ruling in a carefully reasoned memorandum of decision. Kneer appealed. Thomas Murray, an abutter and the intervener, filed a cross appeal. Despite the cogency of the judge's explanation for his ruling, we conclude that he misapplied the relevant legal principles. We therefore vacate the judgment and remand this case for further proceedings.
Background. The recitation that follows is drawn from the judge's detailed findings of fact, none of which has been shown to be clearly erroneous. We supplement those findings slightly based on the agreed-to documentary evidence and other undisputed background evidence.
*499 NPS, LLC v. Minihane, 451 Mass. 417, 418, 886 N.E.2d 670 (2008).
1. The adoption of the town zoning by-law. The town adopted its first zoning by-law in 1953. That by-law established a minimum lot size of 15,000 square feet (since increased to 43,500 square feet, or approximately one acre, at least in the applicable zoning district). At that time, the land in the neighborhood at issue already had been laid out as lots depicted in a Land Court *550 plan that had been filed in the registry of deeds in 1945. Each of the current properties is comprised of two or more of the originally depicted lots. Thus, the parcel itself is made up of original lots 46 and 47, Mead's own land is made up of lots 44 and 45, and Murray's land is made up of lots 6, 12, and 13. At the time the 1953 by-law was adopted, the lots that now comprise the parcel were held in common with other adjacent lots, including lots 48 and 49. The parcel was severed from that common ownership in 1954.
The 1953 by-law included a grandfathering provision. We reserve for later discussion whether the specific terms of that provision protected the parcel as buildable even though it was held in common ownership with adjacent land when the by-law was adopted.
2. The Kneer family's ties to the Hunter Avenue neighborhood. Although Kneer herself lives elsewhere, all three of her daughters have had significant ties to the town's Hunter Avenue neighborhood. Mead has had the strongest ties; she and her then-husband first purchased property there in 1978, and she has lived at her current property, 11 Hunter Avenue, since 1988.
3. The formation of the trust. Meanwhile, in 2001, Kneer and her husband created the trust as an estate planning tool. The two of them were the trust's sole beneficiaries and cotrustees. They placed various personal assets into the trust, including their bank accounts and investment accounts.
4. The original acquisition of the parcel. The parcel is bordered on the east by 11 Hunter Avenue (owned by Mead) and on the west by 7 Hunter Avenue (owned by Murray). As of 2002, the town had acquired the parcel through a tax taking. Through a public auction, Mead's oldest son, Douglas, acquired title to the parcel on July 15, 2002. However, some nine months later, he transferred title to the person who had provided him with the purchase money, Richard W. Drisko. Drisko was Douglas's uncle by marriage (the husband of one of Kneer's other daughters).
5. The 2010 amendment to the trust. In 2010, Kneer's husband-who had been the trust's cobeneficiary and cotrustee-died. Kneer therefore amended the trust through a restatement dated May 24, 2010 (first restatement). Although Kneer remained the trust's sole beneficiary, Mead was added as a cotrustee. Further details of the trust's terms, as amended, are reserved for later discussion.
6. The trust's purchase of the parcel. In or before 2012, Drisko and his wife divorced. As a result, Kneer "wanted to help sever *551 [her former son-in-law's] ties to the [parcel]." She also "considered that there might come a time when she would want to live near Ms. Mead" (her eldest daughter). Accordingly, on September 14, 2012, the trust-which had been formed more than a decade earlier-purchased the parcel from Drisko for $50,000. As a result, the parcel became held by Kneer and Mead as cotrustees.
7. Efforts to develop the parcel. At least by 2013, Mead began efforts to secure approval to build a small home on the parcel. This included applying for a septic *500 system construction permit and a building permit. The permit applications were in the trust's name, and Kneer was the sole signatory on the documents. Mead did all the spadework in seeking the permits; for example, she was the one who prepared the applications and served as the point of contact for town officials.
8. Procedural history. On July 13, 2013, the town health agent granted the trust approval to install a septic system at the parcel, which was referred to as 9 Hunter Avenue. However, the town building inspector denied the trust's application for a building permit on April 8, 2014. Relying on an opinion letter from town counsel, the building inspector concluded that the parcel was subject to the applicable minimum lot size requirement and therefore was unbuildable. The opinion letter appears to rest on two independent grounds. The first is that the parcel was never subject to grandfathered protection because it was held in common ownership with other undersized lots when the town adopted its zoning by-law in 1953. The second is based on the application of merger doctrine to the trust's acquisition of the parcel in 2012. According to counsel, Mead's serving as cotrustee of the trust and simultaneously owning the adjacent property in her own name meant that the two properties must be considered as one for zoning purposes. The town zoning board of appeals (board) upheld the building commissioner's denial of a building permit based on his first stated ground, without reaching the second. Kneer appealed pursuant to G. L. c. 40A, § 17, and Murray was allowed to intervene as a defendant.
On summary judgment, the judge rejected the argument that the parcel was never subject to grandfathering protection. However, after a two-day trial, he upheld the denial of the building permit on the second ground, namely that, as of the date the trust acquired the parcel in 2012, it merged with Mead's adjacent property. Relying principally on *552 Planning Bd. of Norwell v. Serena, 27 Mass. App. Ct. 689, 690, 542 N.E.2d 314 (1989), S.C., 406 Mass. 1008, 550 N.E.2d 1390 (1990) ( Serena ), the judge focused on whether-through her role as cotrustee-Mead obtained legal control over the parcel at the point the trust acquired it. The judge recognized that, in taking any actions with respect to the parcel (or, for that matter, with respect to any other assets of the trust), Mead was obligated to act consistent with her fiduciary duties to Kneer (who was cosettlor, cotrustee, and sole remaining beneficiary). He also recognized that, with or without cause, Kneer could at any time terminate Mead as cotrustee or even revoke the trust. At the same time, however, as the judge accurately observed, so long as the trust existed and Mead continued to serve as one of its cotrustees, her powers were broad. Most significantly, she could take action with respect to trust assets without first consulting with Kneer, and third parties were informed that they could rely on the actions of one cotrustee acting alone.[3] According to the judge, this provided Mead sufficient control over the parcel that it must be considered as being held in common ownership with the adjacent land that she owned.[4] *501 Discussion. 1. The relationship between grandfathering and merger. It is uncontested that, under the town's current zoning by-law, the parcel does not meet current minimum lot size requirements. Indeed, the parcel became nonconforming when zoning initially was adopted in 1953. It follows that the parcel is unbuildable unless it enjoys grandfathering protection.
By statute, owners of existing lots generally are protected against newly adopted minimum lot size requirements. See G. L. c. 40A, § 6. However, protection offered by grandfathering must be considered in conjunction with the doctrine of merger. That doctrine aptly has been summarized as follows: "[A]djacent lots in common *553 ownership will normally be treated as a single lot for zoning purposes so as to minimize nonconformities." Preston v. Board of Appeals of Hull, 51 Mass. App. Ct. 236, 238, 744 N.E.2d 1126 (2001), quoting from Seltzer v. Board of Appeals of Orleans, 24 Mass. App. Ct. 521, 522, 510 N.E.2d 309 (1987). Although merger has its roots in the common law, "[t]he statutory 'grandfather' provision contained in G. L. c. 40A, § 6, incorporates this doctrine by providing protection from increases in lot area and frontage requirements only to nonconforming lots that are not held in common ownership with any adjoining land." Carabetta v. Board of Appeals of Truro, 73 Mass. App. Ct. 266, 269, 897 N.E.2d 607 (2008). Thus, the statute itself does not protect undersized lots from merger. However, a town may adopt more generous grandfathering protection if it does so explicitly. Marinelli v. Board of Appeals of Stoughton, 65 Mass. App. Ct. 902, 903, 840 N.E.2d 61 (2005).
The town's zoning by-law now offers grandfathering protection that is coextensive with that offered by G. L. c. 40A, § 6. Therefore, it is undisputed that the parcel currently is not protected from merger, and that it therefore is no longer buildable if it merged with Mead's adjacent property. Before turning to that question, we first examine the subject of Murray's cross appeal, that is, whether the parcel ever enjoyed grandfathered protection when the town adopted zoning in 1953, or whether instead, as the board concluded, merger applied at that time.
2. Alleged merger in 1953. The section of the 1953 by-law that established minimum lot size and frontage requirements included a grandfathering provision that stated as follows: "Lots shown on any plan duly recorded by deed or plan at the time this [by-law] is adopted may be used." We agree with the judge that this language plainly intended to offer grandfathering protection to then-existing lots so long as at that time the lots were shown on a plan that had been recorded. See Shirley Wayside Ltd. Partnership v. Board of Appeals of Shirley, 461 Mass. 469, 474-475, 961 N.E.2d 1055 (2012), and cases cited (while deference is due to reasonable interpretations of by-law by relevant local officials, meaning of by-law is ultimately question of law for courts). It is uncontested that lots 46 and 47 (of which the parcel is comprised) were depicted on a plan that was recorded eight years prior to the adoption of the 1953 by-law. Accordingly, these lots did not lose their grandfathered protection simply because they were held in common ownership with other adjoining lots in 1953. See *502 Marinelli, 65 Mass. App. Ct. at 903, 840 N.E.2d 61. Lots 46 and 47 then were severed from common ownership with other adjacent lots in 1954 *554 prior to the town's tightening of its grandfathering provision.[5] The judge correctly determined that the parcel did not lose grandfathering protection upon the initial adoption of the zoning by-law.[6]
3. Alleged merger in 2012. The key inquiry is whether, as a result of the trust's acquisition of the parcel in 2012, it became held in common ownership with Mead's adjacent property at 11 Hunter Avenue. As the judge observed, the case law recognizes that lots can be deemed to be held in common ownership under the doctrine of merger even if they nominally are owned by different entities. We turn next to examining representative cases that illustrate this principle.
In Serena, 27 Mass. App. Ct. at 690, 542 N.E.2d 314, S.C., 406 Mass. 1008, 550 N.E.2d 1390, the case on which the judge primarily relied in his memorandum of decision, a married couple wanted to subdivide property they owned into two buildable lots. To avoid the effects of an anticipated change to the zoning by-law, they transferred one lot to themselves as tenants by the entirety and the other to themselves as trustees of a *503 realty trust of which they were the sole beneficiaries. Serena, 406 Mass. at 1009, 550 N.E.2d 1390. The Land Court judge there had "concluded that the Serenas were entitled only to one building permit for the combined lots because the Serenas could use the two lots 'as one if they so chose.' " Ibid. In a three-paragraph rescript opinion, the Supreme Judicial Court affirmed the Land Court judgment. Ibid. Despite the brevity of the opinion, it is plain that the court endorsed the principle that "a landowner will not be permitted to create a dimensional nonconformity if he could have used his adjoining land to avoid or diminish the nonconformity." Ibid., quoting from Serena, 27 Mass. App. Ct. at 690, 542 N.E.2d 314 (Appeals Court decision in same case for which further appellate review was granted).[7] *555 Because the property owners in Serena owned one lot as cotrustees of a realty trust of which they were the sole beneficiaries, and owned the adjoining lot personally as tenants by the entireties, they together retained full legal and beneficial ownership of the two lots and were free to use the lots "as one if they so chose."[8] Ibid. Serena thus presented a markedly straightforward case for looking beyond the nominal form of the ownership interests and treating contiguous parcels as being held in common ownership.
A second illustrative example is DiStefano v. Stoughton, 36 Mass. App. Ct. 642, 634 N.E.2d 584 (1994), another case in which an owner unsuccessfully tried to avoid merger by placing some of its property into nominally different ownership. DiStefano involved a forty-lot tract of land that had been owned by a close corporation of which a particular individual was the sole officer and director. Id. at 643, 645, 634 N.E.2d 584. In anticipation of a zoning amendment that would reduce the number of buildable lots, the individual had his company transfer ownership of some of the lots to himself individually, some to his wife, and some to himself as trustee of a realty trust. Id. at 644, 634 N.E.2d 584. This left the property divided in a "checkerboard" pattern, in which "no two [adjoining] lots were held in common" by the same nominal owner. Id. at 643, 634 N.E.2d 584. The Land Court judge in that case found that the same individual retained full control of all of the lots notwithstanding that they nominally became held by four different owners. Ibid. We upheld the judge's ruling that merger applied under these circumstances, pronouncing that "[w]e may disregard the shell of purportedly discrete legal persons engaged in business when there is active *556 and pervasive control of those legal persons by the same controlling person and there is a confusing intermingling of activity among the purportedly separate legal persons while engaging in a common enterprise." Id. at 645, 634 N.E.2d 584, citing My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620-621, 233 N.E.2d 748 (1968) (then, as now, the leading case on piercing the corporate veil). In this manner, we equated disregarding nominally different ownership for purposes of applying the doctrine of merger with "veil piercing."
In these and similar cases, the same person who possessed the power to control the contiguous lots retained the ability to use them as he desired, including to "use[ ] his adjoining land to avoid or diminish the nonconformity." Serena, 406 Mass. at 1009, 550 N.E.2d 1390, quoting from Serena, 27 Mass. App. Ct at 690, 542 N.E.2d 314. Our willingness to look beyond who nominally held legal title to the lots must be seen in this light.
We turn now from the case law to the case before us. Critically, the judge did not rule that the existence of the trust should be disregarded, with Mead herself deemed the real owner of the parcel. To the contrary, the judge relied on the existence of the trust, resting his decision solely on the breadth of Mead's authority as cotrustee. Because Mead possessed broad authority to take actions with respect to trust assets without needing to seek Kneer's prior approval, the judge ruled that this effectively gave her "legal control" of the parcel. In turn, the judge reasoned, the breadth of this authority was sufficient, by itself, to place the parcel in common ownership with the adjacent property that Mead owned individually.
*504 The error in the judge's reasoning is that it passes over the fact that Mead's powers over the parcel necessarily were subject to her fiduciary obligations. See Old Colony Trust Co. v. Silliman, 352 Mass. 6, 10, 223 N.E.2d 504 (1967) ("[E]ven very broad discretionary powers [of a trustee] are to be exercised in accordance with fiduciary standards and with reasonable regard for usual fiduciary principles"). As a trustee, Mead's "first duty [was] the protection of the trust estate," and she could not allow any of her own interests to interfere with those of Kneer, the trust's beneficiary. Johnson v. Witkowski, 30 Mass. App. Ct. 697, 706, 573 N.E.2d 513 (1991). The judge acknowledged that limitation but ultimately found it to be of no moment. We disagree. Mead was not in a position in which she lawfully could have appropriated the parcel as her own; indeed, such conduct would have amounted to an obvious breach of her *557 fiduciary responsibilities. Ibid.[9] Accordingly, despite the breadth of the authority that Mead possessed as cotrustee, she still could not lawfully use the parcel to lessen the nonconformity of her own property with the minimum lot size requirement. It follows that Mead's status as cotrustee of the trust that owned the parcel did not, by itself, render the two properties as being held in common ownership. See Serena, 406 Mass. at 1009, 550 N.E.2d 1390.
None of this is to say that the existence of Mead's fiduciary duties to Kneer necessarily insulated Mead-or the trust-from a claim of veil piercing. Nor do we mean to suggest that the judge could not have considered whether the trust was used as a means of masking an arrangement in which, in reality, it was Mead, not Kneer, who held "the master hand." DiStefano, 36 Mass. App. Ct. at 645, 634 N.E.2d 584. Thus, it may be that the judge was correct to conclude that the parcel and Mead's property should be viewed as a single lot based on grounds different from those on which he relied. We turn next to whether the veil piercing issues can be resolved, as a matter of law, in favor of either party.
There are some established facts that cut in favor of veil piercing and merger. For example, the judge found that Mead "in fact has exercised control over the ... [p]arcel," and he rejected Kneer's claim that Mead was leading the effort to develop it "simply to help her mother."[10] At the same time, however, the judge expressly found that in taking her actions with respect to the property, "Mead was acting in her capacity as [co]trustee." Thus, the mere fact that Mead exercised control over the parcel does not mean that she strayed from her role as a cotrustee faithfully serving Kneer's interests.[11] In addition, there are some established facts that cut against disregarding the difference in the *558 nominal owners. For example, the formation of the *505 trust preceded the purchase of the parcel by more than ten years, and there was no evidence that Mead's addition as cotrustee after her father died was done in anticipation of the trust's eventual purchase of the parcel.[12] Moreover, it is uncontested that in seeking to develop the parcel, Kneer was the one in whose name the permits were sought, establishing that trust formalities were, at least to some extent, observed.
In the end, we conclude that whether the board could disregard the separate ownership here and treat the parcel and Mead's property as one cannot be resolved as a matter of law based on the current findings. It is evident that the trial judge saw little need to address head on whether Mead should be treated as the real owner of the parcel, because he believed the merger issue could and should be resolved on the face of the trust documents. Where, as here, the judge made findings based on an incorrect view of the law but still could be correct for a different reason, "fairness requires a remand to allow the parties and the judge to focus on [the key legal issue we have identified]." Julius Tofias & Co. v. John B. Stetson Co., 19 Mass. App. Ct. 392, 398, 474 N.E.2d 1162 (1985).
Conclusion. In sum, we conclude that the parcel was not rendered unbuildable pursuant to the doctrine of merger as a result of the adoption of the zoning by-law in 1953. We further conclude that the judge erred in ruling-based merely on the breadth of Mead's authority as cotrustee-that merger occurred when the trust purchased the parcel in 2012. Nevertheless, it is possible on this record that facts could be found that would support merger on other grounds.[13] Accordingly, we vacate the *559 judgment and remand the case for further proceedings consistent with this opinion.
So ordered.

This was confirmed by certificates of trust dated September 28, 2012, and January 21, 2016. In those documents, Mead certified under the pains and penalties of perjury that each trustee has "authority to act with respect to the real estate owned by [the] trust by the execution of any one trustee acting alone."

In 2015, after the controversy over potential merger had arisen, the trust was amended a second time. The terms of the trust's second restatement sought to protect the parcel against merger in the event of Kneer's death, e.g., by stating that Mead is not to serve as a trustee in that eventuality and that the parcel is to be placed in trust at that time for Mead unless doing so would "cause the property to merge with [11 Hunter Avenue]." Having determined that merger already occurred in 2012, the judge ruled that the second amendment was irrelevant. See Asack v. Board of Appeals of Westwood, 47 Mass. App. Ct. 733, 736, 716 N.E.2d 135 (1999) (once merger occurs, it cannot be undone).

As the judge observed, exactly when the town tightened the grandfathering provision is not clear on the current record, because the parties submitted only the original zoning by-law and the version in effect in 2013. However, all parties appear to have accepted that the original grandfathering provision remained in place as of 1954, the year the lots making up the parcel became severed from surrounding property.

It is undisputed that, as a result of the town's tightening of its grandfathering provision, lots 46 and 47-the constituent parts of the parcel-have lost their independent status and have merged for zoning purposes. This is a separate question from whether the parcel as a whole merged with adjoining property.

The judge extensively cited to, and quoted from, our opinion in Serena, and the parties treat the Supreme Judicial Court's opinion in that case as affirming our decision. We take this opportunity to note that-unlike in the Federal court system, see 28 U.S.C. § 1254 (2012)-when the Supreme Judicial Court grants further appellate review, it does not affirm or reverse the Appeals Court's opinion; rather, it sits in review of the trial court's judgment. As a result, a Supreme Judicial Court opinion issued in a case in which further appellate review was granted generally supersedes the opinion issued by this court. Of course, the Supreme Judicial Court is free to adopt our reasoning by reference. See, e.g., Renaud v. Commonwealth, 471 Mass. 315, 319 n.6, 28 N.E.3d 478 (2015) ; Commonwealth v. Brown, 479 Mass. 600, 607, 97 N.E.3d 349 (2018). In addition, when a case taken on further appellate review ends in a tie vote in the Supreme Judicial Court, the Appeals Court opinion is resurrected "unless a majority of the participating justices [of the Supreme Judicial Court] decides otherwise." Mass.R.A.P. 24.1, 416 Mass. 1601 (1994).

In fact, in a realty trust, also known as a nominee trust, the powers of trustees are extremely limited; essentially, they serve as agents of the beneficiaries. See Bellemare v. Clermont, 69 Mass. App. Ct. 566, 571, 870 N.E.2d 624 (2007), and cases cited.

Put differently, because Mead's treatment of the parcel as her own would have-by operation of merger-destroyed the ability to develop the parcel (thereby depriving the trust of much of the $50,000 it paid for the parcel), taking such actions would directly conflict with her fiduciary duties as cotrustee.

We additionally note that the judge was skeptical that Kneer herself ever planned to move to the parcel. The import of this issue is not immediately apparent since, needless to say, one can own property without intending to move there.

Of course, it may well be that Kneer has been allowing the parcel to be used in a manner that ultimately will benefit Mead (or, perhaps, Mead's son, Douglas). But that equally could be true if Kneer had purchased the parcel in her own name. That Mead may obtain such benefits now or upon Kneer's death does not by itself mean that she thereby should be deemed the current owner of the property for zoning purposes.

The judge stated that he "consider[ed] neither ... Kneer's testimony regarding her intent to maintain control over the trust's property, nor the testimony of her attorney, ... who drafted the trust documents and provided de bene testimony at trial about his and ... Kneer's intent with respect to the trust's provisions." Nevertheless, the judge went on to state that "[e]ven if [he] did consider that testimony, however, [he did] not believe that ... Kneer truly intended to have sole control over the trust's property." He explained that "[i]f that was her real intention, she would not have added ... Mead as a trustee, or she would at least have made sure that the trust included explicit provisions limiting ... Mead's authority." However, as explained supra, the fact that the trust documents gave Mead broad authority over the trust property (on which third parties were entitled to rely) does not mean that Mead thereby was free to use the property as her own.

Nothing in this opinion should be read as expressing a view on how that issue should be resolved.