NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-759

WILLIAM C. CONNELL

vs.

ROBERT J. MORRISSEY.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, William C. Connell,[1] filed a complaint against his father-in-law, Robert J. Morrissey, claiming Morrissey improperly advised him not to obtain a prenuptial agreement before marrying Morrissey's daughter.  Connell appeals from a judgment dismissing his artfully drafted complaint on statute of limitations grounds.  We reverse the order allowing the motion to dismiss and vacate the judgment.

Background.  We set forth the facts alleged in the complaint, accepting them as we must at this procedural stage as true and drawing all reasonable inferences in Connell's favor.

---

[1] Unless specified otherwise, all references to "Connell" are references to the plaintiff.

See Bassichis v. Flores, 490 Mass. 143, 148 (2022). A resident of Greenwich, Connecticut, Connell is the founder of a private equity firm, one of six beneficiaries of the Connell family trusts, and the sole beneficiary of the William C. Connell 1989 trust (1989 trust).[2] Morrissey was a trustee of the Connell family trusts and the 1989 trust until his resignation in August 2020.

Morrissey, a named partner at his own trusts and estates law firm, was a close personal friend of Connell's father,[3] who personally selected Morrissey to serve as trustee of the Connell family trusts and to protect the Connell family assets. A major donor of his time and money, Morrissey has held "positions of responsibility at significant institutions in Massachusetts and beyond." For decades, Morrissey served as a member of the Connell Limited Partnership advisory board with Connell, and, in that capacity, Morrissey gained direct knowledge of the Connell family assets. Morrissey held himself out to Connell as a

_____

[2] Connell also holds a minority interest in Connell Family Partnership III with his siblings. Connell's father founded Connell Limited Partnership, which Connell alleges was, at its peak, one of the largest privately held companies in the United States. In the 1980s and 1990s, Connell's father placed ownership of that entity and other family assets into a series of trusts.

[3] The elder Connell, William F. Connell, passed away in 2001.

2

trusted counselor and advisor to wealthy families and institutions, and as a man of "substantial personal wealth."[4] The Connell family trusts have paid Morrissey millions of dollars for his services.

In 2006, Connell became engaged to Morrissey's daughter, Pamela.[5]  Connell had not been married before; Pamela was divorced and had three children from her prior marriage.  When Connell broached the subject of a prenuptial agreement, Pamela informed Connell that "she would follow her father's direction." Both Connell and his personal attorney then spoke separately with Morrissey about the topic.  During his conversation with Morrissey, Connell explained that he wanted a prenuptial agreement, and that "he was primarily worried about protecting the trusts and [his] premarital assets."  Morrissey informed Connell that "he had nothing to worry about, [and] that a prenuptial agreement was unnecessary."  Morrissey held himself out as having "superior knowledge" of the couple's respective financial positions, and he represented to Connell that "only he

_____

[4] Morrissey owned multiple homes, high-end cars, and a boat, and flew on private jets.

[5] Because Connell's complaint refers to the plaintiff as "Connell" and to Connell's wife as "Pamela M. Connell," we refer to the wife by her first name to avoid confusion.

3

had sufficient knowledge of both Pamela's and Connell's finances to weigh in on the need for a prenuptial agreement."[6]

Connell's attorney subsequently met with Morrissey in September 2006 and informed him that Connell wanted a prenuptial agreement, and that he had recommended that Connell obtain one. In response, Morrissey "purported to explain Pamela's financial situation," stating, "Pamela was giving up a lot by marrying Connell." Morrissey also repeated his representation that he was the only one with knowledge of both sides' financial situations, which qualified him "to weigh in on the need for a prenuptial agreement." Connell's attorney later repeated this conversation to Connell.

Connell understood from these two conversations that the Connell family trust assets and premarital assets were protected in the event of a future divorce -- even without a prenuptial agreement in place -- and that, given Morrissey's substantial personal wealth, Pamela "would have no reason to ever seek Connell family assets and would never do so." Connell alleged that he believed Morrissey was acting in his and the Connell family's best interests when he advised against the prenuptial

---

[6] Connell understood Morrisey's claim to "knowing the finances on both sides" to refer to Morrissey's substantial personal wealth, Pamela's financial situation, and the financial support Morrissey had provided to and would continue to provide to Pamela.

4

agreement, and that he believed Morrissey's representations. Connell never "imagined that Morrissey would betray [his deceased, close personal friend] by doing anything other than what was best for Connell and his family, even in a matter involving Morrissey's own daughter."[7]

On December 30, 2006, Connell married Pamela without a prenuptial agreement. After thirteen years of marriage and the birth of two children with Pamela, Connell commenced divorce proceedings against her in the Connecticut Superior Court. One of Pamela's first actions was to file a document request seeking production of all documents relating to the Connell family trusts, of which Connell is a beneficiary. In August 2020, Pamela also sought to add the trustees of the 1989 trust, including her father, as parties to the divorce action, and sought an order directing the trustees to make distributions from the 1989 trust for her benefit. The lack of a prenuptial agreement has thus "substantially" increased Connell's litigation costs in the Connecticut divorce action.

Discussion.[8] The issue presented is whether Connell's breach of fiduciary duty, fraud, and gross negligence claims,

_____

[7] As we have noted, we are constrained to accept this allegation as true. See Bassichis, 490 Mass. at 148.

[8] In the trial court, Connell objected to Morrissey's improper attempt to file a motion to dismiss pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), after he had filed

5

and his request for declaratory relief, accrued at the time of his marriage in 2006, as Morrissey contends, or, as Connell argues, when Pamela sought to access information about his trusts in 2020.  At this procedural stage, where we are constrained to accept the truth of the facts as alleged in the complaint, Bassichis, 490 Mass. at 148, Connell has the better argument.

The parties agree that all claims are subject to a three-year limitations period, see G. L. c. 260, § 2A, and that the actual knowledge standard applies.  See Tocci v. Tocci, 490 Mass. 1, 12 (2022) ("Where claims arise out of a fiduciary relationship, the statute of limitations is tolled until a plaintiff has actual knowledge that [he or] she has been injured by the fiduciary's conduct" [quotations and citation omitted]).  See Doe v. Harbor Schs., Inc., 446 Mass. 245, 254-255 (2006).  As explained by the Supreme Judicial Court, in the context of a trustee relationship, "a cause of action for breach of fiduciary duty does not arise until the beneficiary is aware that

_____

an answer.  See Holmquist v. Starr, 402 Mass. 92, 93 n.4 (1988).  The judge analyzed the motion under rule 12 (b) (6).  Nothing in our decision turns on this procedural irregularity, as a motion for judgment on the pleadings under Mass. R. Civ. P. 12 (c) is "akin" to a rule 12 (b) (6) motion, Jarosz v. Palmer, 436 Mass. 526, 530 (2002), and the same de novo standard of review applies.  See Luu v. Fallon Serv., Inc., 105 Mass. App. Ct. 236, 239 (2025); Ridgeley Mgmt. Corp. v. Planning Bd. of Gosnold, 82 Mass. App. Ct. 793, 797 (2012).

repudiation has occurred." Lattuca v. Robsham, 442 Mass. 205, 213 (2004). "Constructive knowledge is insufficient." Id. The critical moment for accrual purposes is not when the "plaintiff gains knowledge of any wrongdoing by the fiduciary but, rather, . . . [when] the plaintiff gains knowledge of the particular harm forming the basis for his or her claim." Tocci, supra at 12-13.

Here, Morrissey's alleged repudiation of trust, fraudulent misrepresentations, and breach of duty occurred in 2006. See Kneer v. Zoning Bd. of Appeals of Norfolk, 93 Mass. App. Ct. 548, 556 (2018) (trustees cannot allow own interests to interfere with those of beneficiaries). Connell, however, did not learn of the harm flowing from Morrissey's wrongdoing until his divorce proceedings began. On March 16, 2020, Pamela's attorney filed the first of several motions seeking discovery about the Connell family trusts and other premarital assets, and in August 2020, the attorney sought distributions from the trusts to Pamela. At some point between March 16, 2020, and August 2020, when Pamela sought to add the trustees of the Connell family trusts as parties to the divorce action and Morrissey resigned as a trustee, Connell (1) knew unequivocally that his trust assets were being targeted "aggressively" in the divorce proceedings and that, absent a prenuptial agreement, the Connell family trusts and his premarital assets could be at

7

risk;[9] and (2) began incurring significant attorney's fees to defend his trust and premarital assets that, until that time, he had thought were safe.  Connell's actual knowledge of the harm forming the basis of his claims then triggered the running of the limitations period.  See Tocci, 490 Mass. at 12-13.  This action, filed on March 7, 2023, was therefore timely.

Accordingly, we disagree with the ruling that Connell's claims accrued on the day he married Pamela in 2006 without a prenuptial agreement.  Connell certainly knew about the importance and benefits of a prenuptial agreement and some of Morrissey's wrongdoing at that point, such as Morrissey's obvious conflict of interest.  As he alleges the facts, however, he was then unaware that he had been harmed by Morrissey's advice to forgo that protection.

For two reasons, at the time of his marriage, Connell was operating under the belief that the Connell family assets would never be at risk in the event of divorce.  First, Morrissey, a prominent trusts and estates attorney, had been selected by

_____

[9] According to the allegations of the complaint, the Connell family trusts and the 1989 trust, which are not in the record, are "sole discretion" trusts.  Pamela has alleged that certain transfers to the 1989 trust were fraudulent conveyances.  We take judicial notice that the question whether the trust assets can be reached by Pamela has not yet been decided by the Connecticut court.  The divorce case is scheduled for trial in October 2025.

Connell's father to protect the family assets, and Connell understood that "as a trustee from the outset," Morrissey knew the terms of the trusts established to fulfill that goal. Morrissey specifically assured Connell that, in his expert opinion, a prenuptial agreement was unnecessary in the event of divorce, causing Connell to reasonably believe that the attorneys who drafted the trusts had made sure the assets were unreachable by a spouse. Second, Connell believed that, in marrying Pamela, he was joining another very wealthy family and that, given Morrissey's own financial success, "Pamela would have no reason to ever seek Connell family assets and would never do so." As Connell alleges the facts, therefore, he was not yet aware of the harm that he had suffered in 2006, see Doe, 446 Mass. at 255 ("Mere suspicion or mere knowledge that [a] fiduciary has acted improperly does not amount to actual knowledge that [a] plaintiff has suffered harm"), and the

complaint in this case was thus not time-barred.[10]

The order allowing the motion to dismiss is reversed, the judgment is vacated, and the case is remanded for further proceedings consistent with this memorandum and order.

<u>So ordered</u>.

By the Court (Ditkoff, Hand & Walsh, JJ.[11]),

Clerk

Entered:   June 11, 2025.

---

[10] We are not blind to the improbability of Connell's prevailing on his claims where he had independent counsel and Morrissey was representing the interests of his daughter and own family in his discussions with Connell's counsel.  Nor have we overlooked the fact that this lawsuit is being used to gain tactical advantage in the Connecticut divorce case. Nonetheless, untimeliness is not among the complaint's flaws.

[11] The panelists are listed in order of seniority.