MICHAEL BELLEMARE *vs.* GERTRUDE A. CLERMONT,
individually and as trustee.[1]

No. 06-P-1047.

Essex. February 13, 2007. - July 18, 2007.

Present: RAPOZA, C.J., CYPHER, & COWIN, JJ.

*Lead Poisoning. Words,* "Owner."

A Housing Court judge properly granted summary judgment in favor of the
defendant, who held title to certain property as trustee of a real estate trust
but had no financial interest in the trust property or any independent
authority with respect to it, on a claim that she was liable for the plaintiff's
lead paint poisoning (allegedly contracted while the plaintiff was a resident
at the property), where a nominee trust was intended with respect to the
property, even though the trust instrument used was not the kind of instru-
ment normally used to create such trusts, and where the Legislature did not
intend that nominee trustees should be exposed to liability under the lead
poisoning statute, with or without its added definition of "owner" as one
having "charge or control of the premises." [568-575]

CIVIL ACTION commenced in the Northeast Division of the
Housing Court Department on February 13, 2004.

The case was heard by *David D. Kerman*, J., on a motion for
summary judgment.

*Martin Kantrovitz* (*Stacie Sobosik* with him) for the plaintiff.
*Joseph C. Clermont* for the defendant.

COWIN, J. Alleging that the defendant, Gertrude A. Clermont,
was an "owner" of certain residential premises in Lowell, the
plaintiff, Michael Bellemare, asserted claims against her and oth-
ers for childhood lead paint poisoning allegedly contracted while
he was under the age of six and a resident at the property. See
G. L. c. 111, § 199. A judge of the Housing Court allowed the
defendant's motion for summary judgment, ruling that, "[i]n the
unique circumstances of this case, it could not be found that [the

---

[1] Of the R.D. and L. Realty Trust.

defendant] was an 'owner' of the property within the meaning of the Childhood Lead Poisoning Prevention and Control Law." On appeal, the plaintiff argues that, because the defendant held title to the property as trustee of a real estate trust, she qualifies as an owner under the statute and is consequently liable in accordance with the statutory terms. We agree with the judge that the Legislature did not intend to impose liability on a person in the defendant's position on the facts present here, and accordingly affirm the judgment.

1. *Background.* For purposes of the summary judgment proceeding, the material facts are not disputed. On September 1, 1977, an instrument prepared by Attorney Francis K. Monarski, now deceased, created the R.D. and L. Realty Trust (trust) as a vehicle by which his client, Raymond J. Descheneaux, would hold real estate. Raymond J. Descheneaux and his wife, Gloria Descheneaux, were, either individually or together, the shareholders[2] of the trust throughout. The original trustees were Raymond J. Descheneaux and the defendant, Attorney Monarski's secretary, who had been employed by him in that capacity since 1959 and who continued to work for him until 1996.[3] On December 29, 1977, residential property at 171 High Street, Lowell (premises), was conveyed to the defendant and Raymond J. Descheneaux in their capacities as cotrustees of the trust.

The plaintiff was born on March 1, 1983, and resided at the premises from March, 1984, to September or October, 1985. At the time, the premises contained a hazardous level of lead on both its exterior and interior surfaces in violation of applicable law. See St. 1971, c. 1081, § 1, inserting §§ 190-199 in G. L. c. 111. The plaintiff was diagnosed with lead poisoning in the fall of 1985, and has experienced ensuing effects.

The defendant served as a cotrustee of the trust from its creation on September 1, 1977, until she resigned from the posi-

---

[2]The trust instrument uses the term "shareholders" rather than "beneficiaries." See discussion *infra.*

[3]We take notice that, at least at the time in question, it was a common practice for lawyers whose clients were involved in real estate transactions to create trusts to which the property would be conveyed, and to designate an office employee, often a secretary, to serve as a nominal trustee. For further discussion of the so-called "nominee trust," see *infra.*

tion on December 12, 1984.[4] Thus, she was a trustee for a portion of the period during which the plaintiff resided at the premises. The defendant was involved as a trustee at the direction of Attorney Monarski, her employer, and as an accommodation to his clients. She exercised no control over the premises, decisions regarding the premises being made exclusively by the trust shareholders, and she derived no benefit from her position as trustee.

In 2004, the plaintiff commenced this action seeking damages for his injuries from the defendant, individually and as trustee; from Raymond J. Descheneaux, individually and as trustee; and from Gloria Descheneaux, individually. The complaint alleges violations by the defendants of the lead poisoning prevention act, warranty of habitability, and G. L. c. 186, § 14, regarding quiet enjoyment.[5] The defendant filed and served a third-party complaint for indemnification against the estate of Francis K. Monarski. On the defendant's motion for summary judgment on the plaintiff's complaint, the judge determined that she was not an owner for purposes of the lead poisoning prevention act. He concluded as well that she did not know, or have reason to know, that a child under six years of age lived at the premises. The plaintiff filed a timely notice of appeal from a separate and final judgment, see Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), dismissing his complaint as to the defendant.

2. *Discussion.* As adopted in 1971, and in effect at the time of events in this case, the statute governing lead poisoning prevention and control provided, in sections relevant to the present case, that "[w]henever a child or children under six years of age resides in any residential premises in which any paint, plaster or other accessible materials contain dangerous levels of lead as defined . . . , *the owner* shall remove or cover said paint, plaster or other material so as to make it inaccessible to children under six years of age" (emphasis supplied). G. L. c. 111, § 197. A violation of § 197 "may be treated by any party as a violation of the state

---

[4]On May 31, 1979, Raymond J. Descheneaux resigned as a trustee of the trust and was replaced by his wife, Gloria Descheneaux.

[5]The plaintiff has not made separate arguments with respect to the warranty of habitability or the right to quiet enjoyment. We assume that those claims stand or fall with a determination whether the defendant is an owner for the purposes of this case.

sanitary code and all procedures and remedies applicable to such violations of said sanitary code shall be available to correct, deter or punish violations [thereof]." G. L. c. 111, § 198, as inserted by St. 1971, c. 1081, § 1. "*The owner* of any residential property shall be liable for all damages caused by his failure to perform the duties required of him pursuant to . . . section one hundred and ninety-seven" (emphasis supplied). G. L. c. 111, § 199. An owner who has been notified of a dangerous level of lead in accordance with G. L. c. 111, § 194, and who does not correct the dangerous condition, is subject to punitive damages. *Ibid.*

These sections impose strict liability. "[N]either negligence nor knowledge of the risk is an element of liability under the first paragraph of § 199." *Bencosme* v. *Kokoras*, 400 Mass. 40, 43 (1987). An owner is declared by the statute to be liable "for all damages caused by his failure to perform the duties required of him pursuant to . . . [§ 197]." G. L. c. 111, § 199. Thus, an owner's knowledge that lead paint is present at the premises or that a child under six is a resident is of no consequence, at least as to compensatory damages. In *Underwood* v. *Risman*, 414 Mass. 96, 97 (1993), the Supreme Judicial Court addressed a claim under G. L. c. 93A where the defendant's knowledge had a bearing on his exposure under the statute, a situation not informative with respect to the implications of the lead poisoning prevention and control act.[6] The only question in the present case is whether this defendant is an "owner" as contemplated by the statutory provisions, and we turn to a consideration of that issue.

When the lead poisoning law was approved in 1971, the term "owner" was not defined. The cause of action in the present case arose in 1984 when the plaintiff first lived at the premises and while the version of the law that lacked a definition of "owner" was in effect. The statute remained in place with the term undefined until 1994, when a definitions section was added. See G. L. c. 111, § 189A, inserted by St. 1993, c. 482, § 3. That new § 189A provides, in relevant part, that an "owner" is "any person who alone or jointly or severally with others (i) has legal title to any premises; [or] (ii) has charge or

---

[6]An accompanying claim by the plaintiff in *Underwood* v. *Risman, supra,* under G. L. c. 111, § 199, failed because the defendant had not been the owner of the real estate at the time that the plaintiff was allegedly injured.

control of any premises as an agent who has authority to expend money for compliance with the state sanitary code, executor, administrator, trustee or guardian of the estate or the holder of legal title."[7] The plaintiff acknowledges that this language was not in place when he lived at the premises or when the defendant held the position of cotrustee, but argues that the section sets forth normal attributes of the ownership of real estate that may fairly be considered when applying the undefined term "owner" in the pre-amendment statute.

We are not persuaded that the change in the statute that defined "owner" as indicated above can be treated quite so casually. A trustee in the defendant's position at that time could reasonably have construed the term as referring to one who has an economic interest in, and control of, the property, i.e., one with the normal incidents of ownership. That the Legislature chooses to expand the definition for regulatory purposes does not mean that newly created exposure (if it is indeed newly created) can necessarily be imposed on a defendant retroactively. See *St. Germaine* v. *Pendergast*, 416 Mass. 698, 703-704 (1993) (retroactive expansion of exposure under State Building Code held unconstitutional); *Pielech* v. *Massasoit Greyhound, Inc.*, 441 Mass. 188, 194-195 (2004) (retroactive application of statute regarding religious discrimination held unconstitutional). This is particularly so where the Legislature has given no indication that it expects the change to be retroactively applied. See *St. Germaine* v. *Pendergast, supra* at 702. Be that as it may, we are of the view that the differences in the statute are of no consequence, because this defendant cannot be deemed to be an "owner" of these premises even under the subsequent definition of that term.

It appears from the circumstances at the time that Attorney Monarski, as well as his clients (Raymond and Gloria Descheneaux), contemplated that title to the premises would be held in a so-called "nominee trust." Such a trust has been defined, unlike a traditional donative trust, as "an entity created for the purpose of holding legal title to property with the trustees having only perfunctory duties." *Morrison* v. *Lennett*, 415 Mass.

---

[7]Substantially similar language had already appeared in an applicable regulation of the Department of Public Health adopted in 1989. See 105 Code Mass. Regs. § 460.020 (1989).

857, 860 (1993), quoting from *Johnston* v. *Holiday Inns, Inc.*, 595 F.2d 890, 893 (1st Cir. 1979). The trustees possess "only the barest incidents of ownership." *Id.* at 861. It is "the beneficiaries [who] exercise the controlling powers, and the action which the trustees may take on their own is very limited." *Worcester* v. *Sigel*, 37 Mass. App. Ct. 764, 768 (1994).

In the nominee trust context, the trustees act only at the direction of the beneficiaries. *Roberts* v. *Roberts*, 419 Mass. 685, 687 (1995), citing *Morrison* v. *Lennett, supra.* Thus, "[n]ominee trusts have characteristics of both agency and trust," *Roberts* v. *Roberts, supra* at 688, in that the trustees hold title for the benefit of others, but also take direction from those persons or entities who hold the beneficial interests. "Where a person is both agent and trustee for another, 'the agency relation . . . predominates.' " *Penta* v. *Concord Auto Auction, Inc.*, 24 Mass. App. Ct. 635, 640 (1987), quoting from 1 Scott, Trusts § 8, at 95 (4th ed. 1987). It is for these reasons that "[i]n prior decisions, involving nominee provisions in trust instruments, this court has disregarded the trustees' record ownership of the property and liability has been imposed directly on the beneficiaries." *Morrison* v. *Lennett, supra* at 862, citing *First Natl. Bank* v. *Chartier*, 305 Mass. 316, 320-321 (1940), and Birnbaum, The Nominee Trust in Massachusetts Real Estate Practice, 60 Mass. L.Q. 364, 368 (1976). Liability has been imposed directly upon beneficiaries on the theory that the trustees are agents for the principals' convenience. See *Apahouser Lock & Sec. Corp.* v. *Carvelli*, 26 Mass. App. Ct. 385, 388 (1988); *Federal Deposit Ins. Corp.* v. *Porter*, 46 Mass. App. Ct. 241, 244 (1999).

We are persuaded that a nominee trust was intended because it is obvious that the trust beneficiaries (shareholders) intended to control the property themselves and did not plan to delegate that control to their attorney's secretary. Furthermore, there were no occasions on which the defendant sought to exercise authority with respect to the trust property, and no benefits of any kind that the defendant realized as a result of her position as trustee. Her contention that she agreed to have her name used as trustee only as an accommodation to her employer's clients appears to be accurate.

What complicates the case is that the trust instrument selected by Attorney Monarski is not the kind of instrument normally used to create a nominee trust. While entitled "Real Estate Trust," the instrument is in fact that of a Massachusetts business trust. See Eno & Hovey, Real Estate Law § 57.5 (4th ed. 2004). Contrast § 57.2 of the same text, which sets forth a sample instrument of a nominee trust. Thus, in the instrument chosen by Attorney Monarski, the beneficiaries are referred to as "shareholders"; the trustees are empowered to operate the trust free of control by the beneficiaries; and the provision normally found in nominee trust instruments — that the trustees shall take direction from the beneficiaries on all matters — is absent.

We are confronted, therefore, with a distinction between what the beneficiaries, the trustees, and the parties' counsel intended to create (i.e., an entity controlled by the beneficiaries as the real parties in interest), and the legal effect of the written instrument that they employed for the purpose (i.e., a declaration of trust that conferred unintended powers on the trustees, including the defendant). Were the evidence in conflict with respect to the parties' intentions, we would of course be greatly influenced, if not governed altogether, by the language of the written agreement. Where, however, the written agreement is so plainly inconsistent with the parties' purposes, see *Barker* v. *Barker*, 447 Mass. 1012, 1012-1013 (2006), including that the defendant would perform at most perfunctory duties as a trustee, see *Lattuca* v. *Robsham*, 442 Mass. 205, 207 n.6 (2004), we enforce what the parties intended, not their mistaken written product. Indeed, on this record, the written instrument would plainly be subject to reformation.

Instruments, including declarations of trust, that contain drafting errors are frequently reformed once the existence of a mistake is established by "full, clear, and decisive proof." *Barker* v. *Barker*, *supra*, quoting from *Berman* v. *Sandler*, 379 Mass. 506, 509 (1980). See *Loeser* v. *Talbot* 412 Mass. 361, 366 (1992); *DiCarlo* v. *Mazzarella*, 430 Mass. 248, 250 (1999); *Ryan* v. *Ryan*, 447 Mass. 1003, 1003 (2006). "To ascertain the settlor's intent, we look to the trust instrument as a whole and the circumstances known to the settlor on execution." *Pond* v. *Pond*, 424 Mass. 894, 897 (1997). While the present case involves not a drafting or scrivener's error, but rather the choice

of an entire instrument that failed to reflect the intentions of the parties, we believe that the same principles apply. See *Fine* v. *Cohen*, 35 Mass. App. Ct. 610, 616 (1993) (parol evidence admissible to show whether parties intended to impose binding legal obligations on trustees).

We therefore treat the defendant in the capacity that the parties contemplated, i.e., a nominee trustee, and conclude that the Legislature did not intend that she be exposed to liability under the lead poisoning statute either before or after the amendment effective in 1994.[8] We consider *Commonwealth* v. *Advantage Bank*, 406 Mass. 885, 887 (1990), dispositive with respect, at least, to the earlier version of the statute. There, a borrower defaulted on a loan to a secured lender; the mortgagee bank notified the borrower of its intent to foreclose and commenced a proceeding under the Soldiers and Sailors Civil Relief Act of 1940; and the bank began collecting rents from the property pursuant to an assignment of rent agreement. The bank had not, however, either completed the foreclosure proceeding or taken possession of the property.

Affirming the dismissal of the complaint, the Supreme Judicial Court concluded that "the bank is not in actual physical possession and hence, is not an 'owner' for purposes of imposing criminal sanctions under the lead paint statute." *Ibid.* The decision is instructive because the bank, as mortgagee, in fact held a bare legal title to the real estate as soon as the mortgage deed was given. "[I]n Massachusetts, the granting of a mortgage vests [legal] title in the mortgagee to the land placed as security for the underlying debt," with the mortgagor retaining an equitable interest. *Biliouris* v. *Biliouris*, 67 Mass. App. Ct. 149, 162 n.22, quoting from *Maglione* v. *BancBoston Mort. Corp.*, 29 Mass. App. Ct. 88, 90 (1990). Despite the fact that the bank indeed had legal title to the mortgaged property at the relevant time, the court did not equate the holding of such title, in the absence of any beneficial interest or discretionary control, with being an

---

[8]Our application of what the parties intended, as opposed to what they wrote, is not unfair to the plaintiff. There is no suggestion in the record that he, or anyone related to him, relied in any way on the trust instrument when they rented and resided at the premises. They were entitled to rely only on their statutory right to hold responsible the "owner" of the premises, whomever the "owner" is determined to be.

"owner" for purposes of the lead poisoning statute where the bank was not in actual possession. *Commonwealth* v. *Advantage Bank, supra.*

Applying similar reasoning, we do not believe that, even were it to apply retroactively, the addition of § 189A to G. L. c. 111, see St. 1993, c. 482, § 3, whereby a definition of the term "owner" was added, was intended to bring about application of the statute to one in the defendant's position. That § 189A now defines "owner" as one who "has legal title to any premises" should not be read out of context and employed to impose liability on one who is effectively an agent for a principal; who possesses "only the barest incidents of ownership," *Morrison* v. *Lennett*, 415 Mass. at 861; and who neither controls the property nor benefits from its ownership. This is particularly so given that the statute, if applicable, imposes strict liability on whatever party is deemed an owner thereunder. Given that it is presumably the Legislature's purpose to prevent owners of private property from realizing personal financial gain while screening themselves from responsibility for maintaining the property, see *Perez* v. *Boston Hous. Authy.*, 368 Mass. 333, 340 (1975) (State sanitary code), the interpretation of the statute advanced by the plaintiff would bring about precisely the opposite effect, specifically, that an individual who realizes no personal benefit whatever from the property becomes liable for the failures of those who have profited from it. We reject a literal reading of the statute where that reading brings about an absurd result. See *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336 (1982); *Springfield Preservation Trust, Inc.* v. *Springfield Library & Museums Assn., Inc.*, 447 Mass. 408, 423 (2006).

The plaintiff asserts alternatively that the defendant is an "owner" for the purposes of lead poisoning liability because she, alone or jointly with others, had "charge or control of [the] premises as an agent who has authority to expend money for compliance with the state sanitary code." G. L. c. 111, § 189A.[9] He relies, in this regard, on provisions of the declaration of trust dated September 1, 1977, that indicate that "[t]he Trustees shall have the absolute control, management, and disposition of the

---

[9]The viability of the argument again depends on the proposition that the specifics of the definition of "owner" effective in 1994, via St. 1993, c. 482, § 3, inform the term "owner" as it was used in the 1971 version of the statute.

trust property as if they were the absolute owners thereof, free from the control of the shareholders." For the reasons set forth above, we do not view that language as controlling. In addition, the purported authorization is of little practical consequence where a cotrustee (always a shareholder) had to agree to any expenditure, and the trustees were not permitted to obligate the shareholders personally to any borrowings.

Furthermore, the summary judgment record established that the defendant not only had no financial interest in the trust property, but also that she never held or exercised any independent authority with respect to it. The defendant stated in an affidavit that she "never derived any benefit from the subject property, never received any compensation or income from the property, and never exercised any management or control of the property." The plaintiff offered no contrary evidence to dispute these factual assertions, relying as he did on the defendant's status as an "owner" to assert liability against her irrespective of her role with regard to the property. The judge was therefore entitled to accept the defendant's statements as establishing the fact that she exercised no authority over the property. See Mass.R.Civ.P. 56(e), 365 Mass. 824 (1974) (adverse party must set forth specific facts demonstrating existence of genuine issue for trial); contrast *Apahouser Lock & Sec. Corp. v. Carvelli*, 26 Mass. App. Ct. at 387 (no genuine issue regarding relation of defendants, as individuals, to business enterprise). It follows that the plaintiff cannot prevail on the theory that the defendant in fact "has charge or control of [the] premises" in the sense used in G. L. c. 111, § 189A.[10]

*Judgment affirmed.*

---

[10]A further indication that the second definition of "owner" in G. L. c. 111, § 189A, is inapplicable on this record is its requirement that the person in control of the premises also have "authority to expend money for compliance with the state sanitary code." Yet G. L. c. 111, § 127N, inserted by St. 1974, c. 681, which authorizes a tenant in a sanitary code enforcement proceeding to join persons with "authority to decide whether to rehabilitate, or sell or otherwise dispose of the premises," expressly exempts any person whose "decision-making authority is derived solely from its position as a fiduciary if such person has never personally had any financial or possessory interest in the premises."