# IN THE SUPREME COURT, STATE OF WYOMING

## 2019 WY 105

OCTOBER TERM, A.D. 2019

October 17, 2019

MANAGEMENT NOMINEES, INC., a Belize corporation and ALDERNEY INVESTMENTS, LLC, a Wyoming Limited Liability Company,

Appellants
(Plaintiffs),

v.

S-19-0028

EDYTA SKOWRONSKA, individually and on behalf of her minor children, RS and DS,

Appellee
(Defendant).

*Appeal from the District Court of Laramie County*
*The Honorable Catherine R. Rogers, Judge*

*Representing Appellants:*
> Larry B. Jones and Colin M. Simpson, Burg, Simpson, Eldredge, Hersh & Jardine, PC, Cody, Wyoming. Argument by Mr. Jones.

*Representing Appellee:*
> Melinda S. McCorkle, Kline, McCorkle, LLP, Cheyenne, Wyoming. Argument by Ms. McCorkle.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]    Alderney Investments, LLC, (Alderney), a Wyoming limited liability company, is part of a complicated web created by Rudolf Skowronski,[1] one of the wealthiest men in Poland at the time of his disappearance in 2005.  Its members are two Panamanian companies controlled by a Tortolan trust corporation, which took its instructions from a Swiss bank.

[¶2]    After Rudolf's disappearance, conflicting purported transfers of interest in Alderney left the identity of its "beneficial owner" in doubt.  At trial, the Appellants, Management Nominees, Inc. (MNI-Belize) and Alderney, claimed Rudolf's brother-in-law, Rico Sieber, was the "beneficial owner" of the company, that MNI-Belize was its sole member, and that Edyta Skowronska, Rudolf's wife, had wrongfully dissolved Alderney.  Edyta claimed she and two of her children were the 90% "beneficial owners" of Alderney and that MNI-Belize had no interest in it.  The jury reached a verdict in favor of Edyta that MNI-Belize challenged in a renewed motion for judgment as a matter of law.  MNI-Belize again challenges the jury's verdict on appeal, arguing that the district court erred in refusing to enter judgment as a matter of law that it is the sole member of Alderney, and that Edyta's wrongful dissolution of Alderney disqualified her from managing the company.  It also claims there was insufficient evidence to support the jury's verdict that Edyta and two of her children are 90% beneficial owners of Alderney.  We affirm.

## *ISSUES*

[¶3]    MNI-Belize raises several issues that we rephrase and reorganize:

> 1.  Does sufficient evidence support the jury's finding that Edyta and two of her minor children are 90% beneficial owners of Alderney?
>
> 2.  Did the district court err in declining to enter judgment as a matter of law that MNI-Belize was the sole member of Alderney?
>
> 3.  Did the district court err in declining to enter judgment as a matter of law that Edyta was disqualified from participating in the management of Alderney?

---

[1] Several of the individuals involved in this case are related and share similar last names.  We use first names where necessary to avoid confusion.

## FACTS

### The Man Behind the Curtain

[¶4]   In January 2005, Rudolf's wife, Edyta, heard her husband's voice over their home's intercom, buzzed him in, and went back to playing with their two young children. Rudolf never joined them.  Believing him kidnapped, Edyta reported him missing, hired bodyguards, and enlisted the aid of private investigators and fortune tellers.  Her efforts were fruitless—no one involved in this case has seen or heard from him since.

[¶5]   Rudolf had gone to great lengths to conceal his identity in some of his business dealings.  Once vanished, however, the complex networks of trust agreements and international business organizations he constructed proved difficult to understand and control.  It fell primarily to Edyta and Rudolf's sister, Dagmara Skowronska, to disentangle the web.

[¶6]   Alderney, one business within that web, is the subject of this dispute.  None of the individuals involved in this matter have been able to say precisely what sort of business Alderney conducted.  It appears Alderney's sole connection to Wyoming is that it is registered in this state.  Dagmara testified[2] that Alderney "acted with an intermediary and gave advice for real estate transactions" to other businesses, bought and sold receivables, founded companies, and invested in real estate.  Rico Sieber, Dagmara's husband, testified that he did not remember what sort of business Alderney did and that he "would have to look that up."  A 2010 letter from Edyta's then-attorney described Alderney's activities "in certain transactions of great importance, but delicate nature . . . which were intended to remain undisclosed to other entities."[3]  Whatever its business, everyone agreed that Alderney was created to allow Rudolf to retain control of the company without having his name directly associated with it.

[¶7]   Rudolf entered into an agreement that caused Morgan & Morgan Corporation Services S.A. (M&M) to organize Alderney in the summer of 1999.  M&M filed necessary documents with the Wyoming Secretary of State, identifying two Panamanian companies it owned, Management Nominees Incorporated (MNI-Panama) and Nominees Associated Incorporated (Nominees-Panama), as Alderney's members.  The Wyoming Secretary of State issued a "Certificate of Organization of Alderney Investments LLC" on June 29, 1999.

---

[2] Dagmara's deposition was read into the record at trial because she did not come to Wyoming for the proceeding, and the district court refused to allow her to testify remotely.
[3] At oral argument, counsel for MNI-Belize stated that "Alderney [] engages essentially in ownership of other companies" and that the parties have been "reticent to disclose their business activities."

[¶8]   On August 2, 1999, M&M declared that it held "all rights, titles and interests in and to the shares of Alderney" in trust for UEB Services LTD (UEB).  In turn, UEB held those same "rights, titles and interests" in trust, initially for Rudolf.[4]  However, shortly after Alderney was created, Rudolf sent a letter to UEB stating that he had transferred "the ownership of . . . Alderney [] to [his] sister, Dagmara Skowronska."  Dagmara, as the "new owner of [Alderney]," sent UEB a "mandate agreement" directing it to act as her agent in administering Alderney.  The same day, UEB created a "Declaration of Trust and Nominee Agreement," declaring that it "held the [r]ights titles and interests" in Alderney in trust for Dagmara and agreeing that it would only use "voting and other [] powers attached to the [Alderney] shares" as Dagmara directed and would not "transfer, deal with or dispose" of those rights except as she directed.

The "Chain of Control"

[¶9]   Dagmara testified that, despite use of the word "owner" and "ownership" in various documents between herself and UEB and between Rudolf and UEB, neither she, Rudolf, UEB, or M&M had ever been the legal "owner" of Alderney.  Instead, the agreements between M&M and UEB, and then between UEB and Rudolf, resulted in MNI-Panama and Nominees-Panama being the legal "owners" of Alderney, with Rudolf retaining the right to control it.  Thus, Dagmara claimed Rudolf's transfer of "ownership" to her gave her the right to control Alderney but did not transfer legal "ownership" of the company to her.[5]  When asked to clarify the purpose of the trust agreement with M&M, she explained:

> A:     Let's imagine that I wanted to purchase a real estate, but I do not want anyone to know that I am the owner of this real estate.  I want to hide it, really hide it, so that nobody knows.  So I tell you to buy this real estate for me, but in your name, with my money . . . and I'm telling you [to] hide it well, because everybody knows

---

[4] The purported agreement between Rudolf and UEB is not in the record; however, several witnesses testified there was a trust agreement between UEB and Rudolf.  No one contests that testimony.

[5] Dagmara attempted to explain Alderney's structure and operation several times during her testimony. For example:

> Q:            But you also said that [M&M] was the owner?
> [Dagmara]:   No, [M&M] was not the owner.  [M&M] was the trustee for the bank.
> Q:            So who's the real person behind the company?
> [Dagmara]:   What do you mean, the "person behind the company"?
> Q:            Well, you described this chain of trustee owners.  Who's the real owner? Who makes the decisions?
>               . . .
> [Dagmara]:   Me.

3

that we know each other.  So that nobody knows that I have anything to do with it. . . . So this way, I am the beneficial owner, but I am not the real owner of the real estate, and you are not the owner either. . . . And the relationship between you and the person who purchases the real estate is that you can tell him what he is supposed to do with this real estate. . . .

Q:     Sure.  So in the case of Alderney, is ownership of Alderney analogous to the real estate in your example?

A:     Well, yes.  The only difference is that a company, an entity, is not the same, what a real estate is.  But taking into account the difference, yes, it's a similar - - it's an analogous situation.

[¶10]  Under this arrangement, Dagmara had to transmit instructions via a "chain of control" in order to cause Alderney to act.  First, she had to instruct UEB concerning an action she wanted Alderney to take.  In turn, UEB would transmit those instructions to M&M.  M&M would then give those instructions to the two member entities of Alderney, MNI-Panama and Nominees-Panama.  Finally, the member entities of Alderney would carry out the instructions via managers.  Finding this process cumbersome and expensive,[6] Dagmara (using this chain of control) caused MNI-Panama and Nominees-Panama to grant her a power of attorney over Alderney.  The power of attorney allowed her to circumvent the chain and take direct action on Alderney's behalf.  It allowed Dagmara to transfer Alderney's assets and enter into contracts on its behalf, but did not allow her to sell the company itself because "[o]nly the owners . . . the Panamanian companies that created [Alderney]" could do that.

Rico "Steps In" for UEB

[¶11]  None of the parties dispute the arrangement as it existed in 1999:  Dagmara, through the "chain of control," had ultimate authority over Alderney; she had a power of attorney allowing her to take direct action on Alderney's behalf; MNI-Panama and Nominees-Panama remained the sole members and legal "owners" of Alderney.  From then on, they agree on very little.  The trouble begins with a purported transfer between Dagmara and her husband, Rico Sieber, in 2003.  Dagmara and Rico claimed that when she was pregnant with their first child, she became worried she would die in childbirth, leaving Rico with no means of support.  Thus, to provide for Rico and their child in the

---

[6] UEB and M&M billed for their services.

4

event of her death, she transferred her interest in Alderney to him. Dagmara, an attorney, did not draft any documents evidencing this alleged transfer.

[¶12] Rico believed that two letters, one from UEB to M&M and one from M&M to him, showed that Dagmara had transferred her interest in Alderney to him, putting him "in control of making decisions for Alderney." The letter from UEB to M&M informed M&M it had "handed over management" of Alderney to Rico Sieber at the direction of one of its clients. M&M then sent Rico a letter stating it had been informed that he was "now responsible for the administration" of Alderney. Rico testified UEB also sent him "all original documents regarding Alderney," including "the Certificate of Membership, the Certificate of Organization, [and] the share register." He asserted that after this occurred, he was the only person authorized to transfer "ownership" of Alderney because he was now its "beneficial owner."

[¶13] Edyta contested whether Dagmara had granted Rico authority to transfer "ownership" of Alderney. During cross-examination, Edyta introduced testimony from two proceedings in 2010 and 2011 in which Rico stated that he did "not know who Alderney Investment[s] belong[ed] to." Further, Rico testified that after receiving the letters and documents related to Alderney, he "did do what UEB did before." Edyta argued Rico merely "stepped in" for UEB, which could only cause Alderney to act at Dagmara's direction and did not have authority to transfer the company to a new "owner" without her instructions. Edyta reasoned that because Dagmara did not die during childbirth, she remained the only person with the authority to control and dispose of Alderney.

Exhibits J and K

[¶14] Edyta did not learn of the alleged transfer to Rico until 2011. The claim was surprising to Edyta, as she believed she and two of her children, R.S. and D.S., had received Dagmara's interest in Alderney in 2005. Edyta asserted that after Rudolf's disappearance, Dagmara agreed to transfer her interest in Alderney to Edyta to provide for her and Rudolf's children. She claimed Dagmara drafted and signed Exhibit J, an "Agreement Regarding the Ownership of the Alderney Company," which disposed of 90% of Dagmara's interest in Alderney, granting 80% of it to R.S. and D.S. and another 10% to Edyta. Edyta also asserted Dagmara drafted and signed Exhibit K, which allowed her to avoid the UEB-M&M chain of control and revoke Dagmara's power of attorney over Alderney directly if she wished to do so. However, Edyta did not immediately revoke Dagmara's power of attorney, stating that she still trusted her at that time and wanted her to continue conducting business on Alderney's behalf.

[¶15] Dagmara denied the authenticity of Exhibits J and K, stating that she would never have drafted them because they "[made] no sense" and that the signatures on them were not hers. She also claimed she had no authority to sign the documents because she had

already transferred her interest in Alderney to Rico in 2003. In response, Edyta called a forensic document examiner who testified with the "highest level" of confidence that the signatures on Exhibits J and K were Dagmara's.

Alderney Tug of War

[¶16] Edyta's trust in Dagmara began to crumble in 2008 or 2009 when Dagmara stopped updating her on Alderney's activities. Edyta hired an attorney, Robert Nogacki, to investigate what was happening with Alderney and whether her interest in it was secure. Mr. Nogacki discovered that Dagmara had been regularly withdrawing money from Alderney's bank accounts without consulting Edyta. Seeking to regain control of the company, Mr. Nogacki sent a series of letters to M&M directing it to revoke Dagmara's power of attorney and to grant a new power of attorney in favor of Edyta. After M&M declined to take any action until "a clear explanation is given by the holder(s) of [Alderney's] Membership certificates," Mr. Nogacki informed M&M that it was "relieved from [its] duties" and directed it to cease taking any action related to Alderney. During the same period, Mr. Nogacki filed various documents with the Wyoming Secretary of State in an attempt to wrest control of the company from M&M and Rico. Rico's representatives responded with their own filings, undoing any changes Mr. Nogacki had made.

[¶17] Weary of the dispute, Rico attempted to settle it in 2012, when he directed M&M to replace Alderney's member entities, MNI-Panama and Nominees-Panama, with MNI-Belize.[7] Represented by an individual named Adelina de Estribi, MNI-Panama and Nominees-Panama executed a "Statement of Assignment of LLC Interests," stating "[f]or consideration received" that the members of Alderney unanimously consented to assign and transfer "their entire interests" in Alderney to MNI-Belize. Rico argued this document showed that MNI-Belize was now the sole member of Alderney. Edyta challenged the validity of the transfer, arguing that: 1) Rico had no authority to cause the member entities to transfer their interests; 2) MNI-Belize had not provided any consideration for the transfer, rendering it invalid; and 3) Adelina de Estribi was not a manager of Alderney and had no authority to transfer the Panamanian members' interests to another company. She also pointed out that there was no amendment to Alderney's operating agreement or articles of organization identifying MNI-Belize as a member.

Course of Proceedings

[¶18] Edyta's own attempt to end the Alderney tug of war led to this lawsuit. In March 2013, she filed Articles of Dissolution of Alderney, and the Wyoming Secretary of State

---

[7] The sole member of MNI-Belize is an entity called Privax Services, Ltd., a Cypriot company (Privax). Rico has a trust agreement with Privax that allows him to control MNI-Belize "through Privax Services."

issued a Certificate of Dissolution.  Eventually, this led MNI-Belize to file a complaint against Edyta in state district court.[8]  The matter proceeded to trial.  Both parties moved for judgment as a matter of law before the case was submitted to the jury.  MNI-Belize argued it was entitled to judgment as a matter of law that it was "the legal owner of Alderney," and that Edyta's dissolution of Alderney was improper.  The district court denied both parties' motions and submitted the case to the jury.  The jury returned a verdict finding that: 1) MNI-Belize was not the sole member of Alderney; 2) the dissolution of Alderney was not properly authorized; 3) Edyta and her children had a "right, title or interest" in Alderney; and 4) Edyta, R.S., and D.S. were the beneficial owners of 90% of Alderney.  MNI-Belize renewed its motion for judgment as a matter of law, arguing the "evidence presented permit[ted] but one conclusion, that being MNI-Belize is the sole member of Alderney."  It also requested the court enter judgment as a matter of law that Edyta "is precluded from exercising any authority over Alderney" due to her wrongful dissolution of the company.  The district court denied the motion and entered declaratory relief incorporating the jury's verdict.  MNI-Belize timely appealed.

## STANDARD OF REVIEW

[¶19]  MNI-Belize argues the district court erred in denying its renewed W.R.C.P. 50 motion for judgment as a matter of law and that there is insufficient evidence to support the jury's conclusion that Edyta, R.S., and D.S are the 90% beneficial owners of Alderney.

[¶20]  "Judgment as a matter of law under Wyoming Rule of Civil Procedure 50 should be granted cautiously and sparingly." *Merit Energy Co., LLC v. Horr*, 2016 WY 3, ¶ 33, 366 P.3d 489, 498 (Wyo. 2016) (citing *Johnson v. Reiger*, 2004 WY 83, ¶ 8, 93 P.3d 992, 995 (Wyo. 2004)).  Nevertheless, the district court is obligated to direct entry of judgment as a matter of law where the evidence is legally insufficient to support a verdict on a particular issue. *Essex Holding, LLC v. Basic Properties, Inc.*, 2018 WY 111, ¶ 59, 427 P.3d 708, 725 (Wyo. 2018) (citing *Dewey v. Wentland*, 2002 WY 2, ¶ 28, 38 P.3d 402, 414 (Wyo. 2002)).  We review the decision to grant or deny judgment as a matter of law de novo, examining the record anew and affording no deference to the district court's conclusion. *Merit Energy Co.*, 2016 WY 3, ¶ 34, 366 P.3d at 498.  Our review of the record focuses on whether the evidence is such that reasonable persons could reach but one verdict. *Id.*  We view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that may be drawn from it. *Id.*  "When the evidence permits more than one reasonable inference or the inferences

---

[8] MNI-Belize originally filed an action in federal district court; however, the Tenth Circuit vacated the district court's order on appeal, concluding that it lacked subject matter jurisdiction. *Management Nominees, Inc. v. Alderney Investments, LLC*, 813 F.3d 1321 (10th Cir. 2016).

favorable to the moving party are subject to doubt, the matter is properly for the jury to decide and a motion for judgment as a matter of law must be denied." *Id.*

[¶21]  In reviewing the sufficiency of the evidence to support a jury's verdict, we assume the evidence in favor of the successful party is true, leave out consideration of conflicting evidence, and afford the successful party every favorable inference that may reasonably and fairly be drawn from it. *Landsiedel v. Buffalo Properties, LLC*, 2005 WY 61, ¶ 5, 112 P.3d 610, 612 (Wyo. 2005) (citing *Daley v. Wenzel*, 2001 WY 80, ¶ 24, 30 P.3d 547, 553 (Wyo. 2001)).

## *DISCUSSION*

### I.  *Sufficient evidence supports the jury's conclusion that Edyta and two of her children are the beneficial owners of 90% of Alderney*

[¶22]  MNI-Belize argues there is insufficient evidence to support the jury's verdict that Edyta and two of her children are the beneficial owners of 90% of Alderney because Exhibits J and K were "outliers" in the "long paper trail" supporting its theory that "Dagmara had transferred all authority over Alderney to Rico Sieber in 2003."  It asserts Edyta's position at trial was "logically inconsistent," that "there is no way that Dagmara would have given [Alderney] back to [Edyta]" if Rudolf had once owned it, and that "the transfer of 'control' to Rico Sieber [in 2003] divested Dagmara of anything that she could transfer to Edyta."  Edyta responds that evidence introduced at trial supports the jury's verdict.

[¶23] We first address the parties' confusing use of the terms "ownership" and "beneficial ownership."  Typically, limited liability companies are composed of one or more members.  *See* Wyo. Stat. Ann. § 17-29-401 (LexisNexis 2019) (discussing how one or more persons become a member of an LLC); 54 C.J.S. *Limited Liability Companies* § 3, Nature of entity (Sept. 2019 Update).  These members are routinely referred to as "owners" of the LLC.  *See, e.g.*, *Mantle v. North Star Energy & Constr., LLC*, 2019 WY 29, 437 P.3d 758 (Wyo. 2019) (referring to member entities of LLC as "owners"); *Montana Food, LLC v. Todosijevic*, 2015 WY 26, 344 P.3d 751 (Wyo. 2015) (referring to LLC members' "ownership interests"); 54 C.J.S. *Limited Liability Companies* § 23, Generally ("The owners of a limited liability company are its members.").  Depending on the terms of an LLC's operating agreement, a member might have a right to distributions from the LLC and the authority to manage the company's affairs.  *See* Wyo. Stat. Ann. § 17-29-102(a)(xxii) ("'Transferable interest' means the right, as originally associated with a person's capacity as a member, to receive distributions from a limited liability company in accordance with the operating agreement[.]"); Wyo. Stat. Ann. § 17-29-407(b)(ii) ("In a member-managed limited liability company, . . . [e]ach member has equal rights in the management and conduct of the company's activities except [in defined circumstances].").  Often, however, the right

8

to distributions from the LLC and the authority to manage it are separate, with members retaining a right to distributions while others (managers) are vested with authority to control the company's operations. *See* Wyo. Stat. Ann. § 17-29-407(c) (discussing operation of a "manager-managed" LLC).

[¶24] Here, MNI-Panama and Nominees-Panama were the initial members of Alderney, and might be referred to as its "owners," as the individuals involved in this case repeatedly did. However, to untangle Rudolf's complex web we must distinguish between Alderney's members and those who controlled and benefited from the LLC. Rudolf created a multi-layer trust network of which he was the ultimate beneficiary. The trusts in this case were "created for the purpose of holding legal title to property with the trustees having only perfunctory duties." *Bellemare v. Clermont*, 870 N.E.2d 624, 629 (Mass. App. Ct. 2007) (quoting *Morrison v. Lennett*, 616 N.E.2d 92, 94 (Mass. 1993)). Here, M&M, UEB, and the Panamanian members possessed "only the barest incidents of ownership" over Alderney in that they were to "act only at the direction of the beneficiaries." *Bellemare*, 870 N.E.2d at 629 (citing *Roberts v. Roberts*, 646 N.E.2d 1061, 1062 (Mass. 1995)); *see* Exhibit 5 MNI-295 Declaration of Trust and Nominee Agreement (UEB agreeing "not to transfer, deal with or dispose of" its interests in Alderney "save as the Owners may from time to time direct" and to "use the voting [] powers attached to [Alderney] shares in such manner and for such purposes as the Owners may from time to time direct . . . and deliver such proxy or proxies in relation to the said share[s] as the Owners shall see fit to direct"). Such trusts are typically referred to as nominee trusts.[9] *In re Grand Jury Subpoena*, 973 F.2d 45, 48 (1st Cir. 1992) (noting that a trustee's "lack [of] power to deal with the trust property except as directed by the beneficiaries" is the key feature of the nominee trust); *Nominee Trust*, Black's Law Dictionary (11th ed. 2019) ("An arrangement for holding title to [] property under

---

[9] Nominee trusts are similar to the so-called "land trust" which

> is created by the execution and recording of a deed in trust transferring all legal and equitable title to real property to a trustee. The original owner is designated as the beneficiary of the trust and retains an assignable personal property interest in the trust. The deed does not identify the beneficiary nor does it describe the terms of the trust. A second document, the trust agreement, is contemporaneously executed and outlines the right of the beneficiary to retain absolute control over the management, use, and disposition of the property and to receive all proceeds from the property. Unlike the conventional trust in which the trustee is vested with broad powers over the management and disposition of the trust property, the land trustee may act only at the beneficiary's direction. The trust agreement is not recorded and normally is kept secret from the public.

*Redfield v. Cont'l Cas. Corp.*, 818 F.2d 596, 607 (7th Cir. 1987); *see also In re Eastmare Dev. Corp.*, 150 B.R. 495, 501 (Bankr. E.D. Mass. 1993) ("Illinois land trusts are similar to the nominee trusts prevalent in Massachusetts."). Dagmara recognized their similarity when describing Alderney's ownership structure using real estate as an example.

which one or more persons or corporations, under a written declaration of trust, declare that they will hold any property that they acquire as trustees for the benefit of one or more undisclosed beneficiaries."). "[N]ominee trusts have characteristics of both agency and trust in that the relationship between the trustee and beneficiary is that of a partnership or principal-agent because the beneficiaries exercise the controlling powers." *Vittands v. Sudduth*, 730 N.E.2d 325, 334 (Mass. App. Ct. 2000) (citing *Roberts*, 646 N.E.2d 1061). Because a nominee trust allows the holding of legal title "in a name other than that of the principal or beneficial owner, . . . a nominee trust may serve the sometimes dubious purpose of concealing the identity of the true owners." Edward C. Mendler, *Massachusetts Conveyancers' Handbook with Forms*, § 16:15 Nominees (4th ed. Aug. 2019 Update). Rudolf accomplished that purpose—to anyone other than those privy to the details of the M&M and UEB trust agreements, it would have appeared that MNI-Panama and Nominees-Panama were the sole "owners" of Alderney.

[¶25] The jury was tasked with unraveling what went on behind the curtain. Without precisely defining the nature of the trust relationships in this case, the parties asked the jury to decide whether Edyta and her children were the 90% "beneficial owners" of Alderney. Jury instruction 29 defined beneficial ownership as "a property right of a person who, through contract, arrangement or understanding, owns and controls property, even though the bare legal title of the property is in another person's name." In essence, they were asked to determine for whose benefit UEB and M&M held Alderney in trust. There was sufficient evidence for the jury to conclude that those entities held 90% of Alderney in trust for Edyta and her two minor children.

[¶26] Edyta testified to the facts and circumstances surrounding the transfer of 90% of Dagmara's interest in Alderney to her and her children. She presented two documents evidencing the transfer and expert testimony concerning their authenticity. She emphasized that Dagmara had not drafted any document evidencing a transfer of her interest to Rico and introduced Rico Sieber's prior testimony stating that he did not know who the owner of Alderney was. She also highlighted his testimony stating that he "did . . . what UEB did before" and documentary evidence showing that UEB had never been the beneficial owner of Alderney.

[¶27] MNI-Belize certainly challenged much of that evidence, introduced its own, and offered an alternative interpretation of the facts. But it was the jury's role to "ascertain[] the facts, reconcil[e] conflicts therein, and draw[] its own inferences if more than one inference [was] permissible." *Wyo. Med. Ctr., Inc. v. Murray*, 2001 WY 63, ¶ 8, 27 P.3d 266, 268 (Wyo. 2001) (citing *Wal-Mart Stores v. Clark*, 969 P.2d 550, 551 (Wyo. 1998)). On appeal, we disregard conflicting evidence, assume the evidence in favor of Edyta and her children is true, and afford her every favorable inference that may reasonably and fairly be drawn from it. *Wyo. Med. Ctr.*, 2001 WY 63, ¶ 8, 27 P.3d at 268. The jury could reasonably and fairly conclude that Edyta and her children were the 90% beneficial

owners of Alderney based on the evidence presented at trial. Their choice is conclusive. *Id.*

## II. The district court did not err in declining to enter judgment as a matter of law that MNI-Belize is the sole member of Alderney

[¶28] MNI-Belize argues it was entitled to judgment as a matter of law that it was the sole member of Alderney because: 1) Edyta did not introduce any evidence showing that "the transfer of membership interests [to MNI-Belize] was invalid for a lack of consideration;" 2) MNI-Panama and Nominees Panama "took sufficient steps to transfer all of the original membership interests to MNI-Belize" despite "failure to strictly comply with the requirements" of Alderney's operating agreement; and 3) "[i]t is possible that the jury was simply confused" because it believed its conclusion that Edyta and her children were the 90% beneficial owners of Alderney "resulted in them also being 'members' of Alderney." Edyta responds that "if the jury concluded Sieber was *not* the beneficial owner of Alderney, it necessarily could conclude that he did not have the authority to cause the transfer of membership interests" from MNI-Panama and Nominees-Panama to his company, MNI-Belize and, thus, that MNI-Belize was not the sole member of Alderney. (Emphasis in original.)

[¶29] Our review of the record leads us to conclude that the evidence presented a jury question as to whether MNI-Belize was the sole member of Alderney. As noted, the trustees of Alderney could only cause the company to act at the direction of the trust beneficiary, that is, the beneficial owner. If the beneficial owner did not instruct the trustees to assign the membership interests of MNI-Panama and Nominees-Panama to MNI-Belize, the trustees had no authority to do so and had no power to bind the beneficial owner to the transfer. *See* Restatement (Second) of Agency § 161A (June 2019 Update) ("A special agent for a disclosed or partly disclosed principal has no power to bind his principal by contracts or conveyances which he is not authorized or apparently authorized to make . . . ."); *see also Brown v. Grady*, 92 P. 622 (Wyo. 1907) (holding an owner of real estate is not bound by an unratified contract for its sale if the special agent acted in excess of his limited authority). The parties introduced conflicting evidence concerning the identity of the beneficial owner(s); thus, there was more than one possibility as to who could direct M&M to assign Alderney's membership interests and whether M&M acted within its authority when it directed the member entities to assign their interests to MNI-Belize. The issue was for the jury to decide, and the district court did not err in denying MNI-Belize's motion and renewed motion for judgment as a matter of law.

## III. The district court did not err in declining to enter judgment as a matter of law that Edyta was disqualified from participating in the management of Alderney

[¶30] MNI-Belize argues the district court erred in declining to enter judgment as a matter of law that Edyta was disqualified from participating in the management of

11

Alderney because "[o]nce the Jury determined that the dissolution was wrongful . . . [she] is precluded from exercising any management authority in Alderney" as a matter of law. Edyta responds that the district court did not err because MNI-Belize never sought a declaration that Edyta was disqualified from participating in Alderney's management prior to its renewed motion for judgment as a matter of law. Rather, MNI-Belize only sought a declaration that Edyta wrongfully dissolved Alderney. Edyta also asserts she is not disqualified from participating in management of Alderney as a matter of law because the statute MNI-Belize relies on only applies to members and managers, not to beneficial owners.

[¶31] MNI-Belize relied on Wyo. Stat. Ann. § 17-29-407(e) to assert that the jury's conclusion that Edyta wrongfully dissolved Alderney automatically disqualified her from participating in its management. The section states that "a person that wrongfully causes dissolution of [a limited liability company] loses the right to participate in management as a member and a manager." Wyo. Stat. Ann. § 17-29-407(e). MNI-Belize assumed this section was applicable to Edyta and would automatically apply to disqualify her from managing Alderney upon a finding that she wrongfully dissolved the company, entitling it to judgment as a matter of law. However, it is undisputed that Edyta was never a member or manager of Alderney. *See* Wyo. Stat. Ann. § 17-29-102(a)(x) ("'Manager' means a person that under the operating agreement of a manager-managed limited liability company is responsible, alone or in concert with others, for performing [] management functions[.]"); Wyo. Stat. Ann. § 17-29-401(d) (identifying how a person becomes a member after a limited liability company is formed). Rather, she seeks to exercise control over Alderney by virtue of her status as a beneficial owner. Thus, it is questionable whether section 17-29-407(e) disqualifies her from participating in Alderney's management, as the section speaks to disqualification from management "as a member and a manager." Other than brief citation to section 17-29-407(e), MNI-Belize did not raise any argument concerning its applicability prior to its renewed motion for judgment as a matter of law, depriving the district court of the opportunity to consider the question before it submitted the case to the jury. A prerequisite to a renewed motion for judgment as a matter of law is that the moving party raised all of the issues in its Rule 50(a) motion during trial that it seeks to raise in the subsequent Rule 50(b) motion. *Guidance Endodontics, LLC v. Dentsply Intern., Inc.*, 728 F. Supp. 2d 1170, 1183 (D.N.M. 2010) (citing *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009)).[10] We therefore hold the district court did not err in declining to enter judgment as a matter of law that Edyta was disqualified from participating in Alderney's management.[11]

---

[10] "Where our rules are sufficiently similar to federal rules[], we consider federal decisions interpreting them persuasive." *Baker v. Speaks*, 2013 WY 24, ¶ 33, 295 P.3d 847, 855 (Wyo. 2013).

[11] Edyta requests attorneys' fees under W.R.A.P. 10.05(b) for responding to this issue. "We are generally reluctant to order sanctions under this rule" but will do so "where an appeal lacks cogent argument, where there is an absence of pertinent authority to support the claims of error, or when there is a failure to cite to

## *CONCLUSION*

[¶32]  When the evidence is such that more than one reasonable conclusion might be drawn from it, as here, the issues are for the jury to decide.  The jury came to a reasonable conclusion based on the conflicting documentation and testimony provided in this case.  We will not disturb that conclusion on appeal.  Affirmed.

---

the record adequately." *Rigdon v. Rigdon*, 2018 WY 78, ¶ 16, 421 P.3d 1069, 1074 (Wyo. 2018) (quoting *Burnett v. Burnett*, 2017 WY 57, ¶ 9, 394 P.3d 480, 483 (Wyo. 2017)).  Although we conclude MNI-Belize failed to adequately raise this issue prior to its renewed motion for judgment as a matter of law, we cannot say its appellate brief entirely lacks cogent argument or citation to pertinent authority or the record.  We therefore decline to award Edyta attorneys' fees.